BAP CASE NO. NC-25-1238
BANKRUPTCY CASE NO. 24-10545-CDN
CHAPTER 11

---

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**FOR THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

WILLIAM ANDREW, as the general
partner of Live Oak Investments LP
Appellant

vs.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS; LEFEVER MATTSON INC.
Appellees.

---

**EMERGENCY MOTION FOR APPELLATE STAY**

---

On Appeal From the United States Bankruptcy Court
Northern District of California, Santa Rosa Division
Honorable Charles D. Novak Presiding

Thomas P. Kelly III, Attorney at Law
Law Offices of Thomas P. Kelly III P.C.
CA 230699, OR 080927, DC 1000147
50 Old Courthouse Square, Suite 609
Santa Rosa, California, 95404-4926
Telephone : 707-545-8700
Facsimile : 707-542-3371
Email : tomkelly@sonic.net
Attorney for Appellant William Andrew

## TABLE OF CONTENTS

| I. | INTRODUCTION | 1 |
|---|---|---|
| II. | PRIOR APPLICATION TO THE BANKRUPTCY COURT | 1 |
| III. | RELEVANT FACTS AND PROCEDURAL HISTORY | 2 |
| IV. | LEGAL ARGUMENT | 10 |
| A. | Legal standard for an appellate stay. | 10 |
| B. | Likelihood of success on the merits. | 10 |
| | 1. LFM was disassociated from Live Oak upon filing a bankruptcy petition. | 10 |
| | 2. The Live Oak agreement is an executory contract under 11 U.S.C. §365. | 13 |
| | 3. LFM breached the Live Oak partnership agreement prior to filing the petition. | 15 |
| C. | Live Oak will suffer irreparable harm as LFM is seeking to dissolve Live Oak. | 18 |
| E. | No substantial injury to other parties. | 19 |
| E. | Public interest. | 19 |
| V. | CONCLUSION | 19 |

## TABLE OF AUTHORITIES

| **STATUTES** | |
|---|---|
| 11 U.S.C. § 362 | 9 |
| 11 U.S.C. § 365 | 13, 14, 20 |
| 11 U.S.C. § 365(c)(1) | 14, 15 |
| 11 U.S.C. § 365(g) | 18 |
| 11 U.S.C. § 541(c)(1) | 15 |
| 11 U.S.C. § 541(c)(1)(B) | 11 |
| Cal. Comm. Code § 2210 | 14 |
| Cal. Corp. Code § 15901.02(ak) | 12, 13 |
| Cal. Corp. Code § 16601 | 10, 15 |
| Cal. Corp. Code § 16601(6)(A) | 10, 11, 19 |
| Cal. Corp. Code § 16603 | 11 |
| Cal. Corp. Code § 16603(1) | 11, 15, 19 |
| Ohio Revised Code §§ 1775.23 | 13 |
| Ohio Revised Code §§ 1782.29 | 13 |
| FRBP § 8005 | 1 |
| | |
| **CASES** | |
| *Butner v. United States* 440 U.S. 48 (1979) | 11, 19 |
| *Evans v. Galardi* 16 Cal.3d 300 (1976) | 12 |
| *Farmland Irrigation Co. v. Dopplmaier* 48 Cal. 2d 208 (1957) | 14 |
| *Fotouhi v. Mansdorf* 427 B.R. 798 (2010) | 11 |
| *Fursman v. Ulrich* 440 B.R. 821 (2010) | 15 |
| *Hilton v. Braunskill* 481 U.S. 770 (1987) | 10, 19 |
| *In re Cardinal Industries Inc.* 105 B.R. 834 (1989) | 12, 13, 19 |
| *In re Catapult Entertainment Inc.* 165 F.3d 747 (1999) | 14, 15, 20 |
| *In re Cutler* 165 B.R. 275 (1994) | 15 |
| *In re Ehmann* 319 B.R. 200 (2005) | 15 |
| *In re Envision Healthcare Corp.* 655 B.R. 701 (2023) | 10 |
| *In re North Plaza LLC* 395 B.R. 113 (2008) | 10 |
| *In re Warner* 480 B.R. 641 (2012) | 18 |

| | |
|---|---|
| *Johnson v. Johnson* 2016 U.S. Dist. LEXIS 38106 (2016) | 11, 19 |
| *Mansdorf v. Epps* 2011 U.S. Dist. LEXIS 171825 (2011) | 11, 19 |
| *Mission Prod. Holdings v. Tempnology* LLC 139 S. Ct. 1652 (2019) | 14 |
| *Nken v. Holder 556 U.S. 418* (2009) | 10 |
| | |
| **TREATISES** | |
| 3 Collier on Bankruptcy P 365.02(2)(b) (16th 2023) | 14 |
| | |
| | |
| | |
| | |
| | |

# I. INTRODUCTION

William Andrew as the general partner of the Debtor-in-possession Live Oak Investments LP (hereinafter "Andrew") presents this application for an appellate stay pursuant to FRBP §8005 in regard to that pending appeal before the this Court bearing case number 25-1238 and case name *Andrew vs. OCUC* (hereinafter "Appellate Case") as arising from the automatic stay order of the United States Bankruptcy Court, Northern District of California, Santa Rosa Division on November 20, 2025 bearing docket entry number 49 in the record of this case. (Hereinafter "Stay Order"; see RJN Ex. I).

The application is based upon the pending appeal before this Court, the pending motion to consolidate Debtor Live Oak Investments (hereinafter "Live Oak") with all of the other debtor entities affiliated with LeFever Mattson Inc. ("hereinafter LFM") having the effect of dissolving Live Oak, and that Live Oak has several million dollars in its bank account which LFM is seeking to distribute to third parties, and that LFM already transferred $2,366,418.00 to itself only four days prior to the filing of its petition. This application is further based on the lack of any legal precedent to support the holding of the Stay Order, the direct contravention of California statutory law, and stands in direct opposition to prior precedents of both the District Courts and Bankruptcy Courts of the Northern District of California.

## II. PRIOR APPLICATION TO THE BANKRUPTCY COURT

Pursuant to FRBP §8005, on December 21, 2025 Andrew applied to the Bankruptcy Court for an appellate stay bearing docket entry 3192-1. This application was heard at 11:00am on January 21, 2026. This application was denied by the Bankruptcy Court at that hearing. This application is being presented the same day as that hearing, and hence a copy of the order denying the application is not presently available.

## III. RELEVANT FACTS AND PROCEDURAL HISTORY

Debtor Live Oak Investments was formed on March 24, 2015 bearing California Secretary of State entity number 2015-08600007. Prior to the formation of Live Oak, in 2004 LeFever Mattson Inc. ("hereinafter LFM") purchased an apartment complex named Southwood Place Apartments located at 410 Buck Avenue, Vacaville, California, 95688-6811 along with several investors. (Hereinafter "Southwood Apartments"). This was confirmed in a letter from LFM to the investors a copy of which is attached to the concurrently filed Declaration of William Andrew and marked as Exhibit A.

In 2015 LFM notified the investors that in order to complete a refinance of Southwood Apartments the proposed lender required the formation of a business entity. A copy of the letter stating this from LFM to the investors is attached to the concurrently filed Declaration of William Andrew and marked as Exhibit B.

To that end, LFM and Kenneth Mattson (hereinafter "Mattson") formed Live Oak, and then prepared a proposed partnership agreement. In exchange for a percentage interest in the Live Oak, the investors transferred their individual interests in Southwood Apartments to the Live Oak. The partnership agreement was executed effective March 25, 2015 and a copy of this agreement is attached to the concurrently filed Declaration of William Andrew and marked as Exhibit C. (Hereinafter "Partnership Agreement").

Pursuant to the terms of the Partnership Agreement, LFM was designated as the General Partner for Live Oak. (Andrew Dec., Ex. C, pg. 7 & 32). The Partnership Agreement also provided for the office of President. (Andrew Dec., Ex. C, pg. 17, §5.2). Pursuant to the terms of the Partnership Agreement, the President was nominated by the General Partner, and the Partnership Agreement directly nominated Mattson as the President. (Andrew Dec., Ex. C, pg. 17, §5.2.3).

Under the terms of the Partnership Agreement, the partners of Live Oak are equity security holders in Live Oak. These interests are confirmed in the Omnibus

List of Equity Security Holders filed by LFM on November 15, 2024 bearing docket entry number 353 in the parallel bankruptcy case of LeFever Mattson Inc. bearing case number 24-10545 currently pending before this Court. (Hereinafter "LFM Bankruptcy Case"). A copy of the Omnibus List of Equity Security Holders is attached to the concurrently filed Request for Judicial Notice (hereinafter "RJN") and marked as Exhibit A.

On June 28, 2024 LFM solicited the agreement of the limited partners to sell Southwood Apartments. A copy of the proposed written consent of the partners is attached to the concurrently filed Declaration of William Andrew and marked as Exhibit D. A sufficient number of partners agreed to sell the property, and on August 29, 2024 it was sold for $10,800,000.00, which resulted in a net amount paid to Live Oak of $3,971,116.96. A copy of the sellers statement for Live Oak is attached to the concurrently filed Declaration of William Andrew and marked as Exhibit E.

On September 4, 2024, these funds were deposited into Live Oak's account at Citizens Business Bank bearing account number XXXXX0673. This deposit is disclosed in the October 28, 2024 operating report for Live Oak, a copy of which is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit B. The specific transaction is reflected in that operating report which includes the bank account statement as follows:

**Deposits**

| Date | Description | Amount |
|------|-------------|--------|
| 09/04/2024 | DEPOSIT | $3,971,116.96 |
| | | 1 item(s) totaling $3,971,116.96 |

(RJN, Ex. B, pg. 19).

Without any notice to the other partners of Live Oak, and without any partnership meeting, the same day as the funds were deposited, September 4, 2024, LFM acting as the general partner transferred substantial sums from Live Oak to itself. These consisted of three transactions in the amount of $1,200,000.00,

$324,000, and $842,418 for a total of $2,366,418.00. The first transaction was from Live Oak's money market account at Citizens Bank which is reflected in the same operating report as follows:

| Other Debits | | |
|---|---|---|
| Date | Description | Amount |
| 09/04/2024 | OTC Transfer | $1,200,000.00 |
| | | 1 item(s) totaling $1,200,000.00 |

(RJN, Ex. B, pg. 19).

The second and third transactions were paid from Live Oak's property trust account also at Citizens Bank which is reflected in the same operating report as follows:

| Other Debits | | |
|---|---|---|
| Date | Description | Amount |
| 09/04/2024 | 399740 OLB TRANSFER SPCLTY AA XXXXX6251 | $324,000.00 |
| 09/04/2024 | 400467 OLB TRANSFER SPCLTY AA XXXXX6251 | $842,418.00 |
| | | 2 item(s) totaling $1,166,418.00 |

(RJN, Ex. B, pg. 20).

LFM maintains this represents the 21.214% ownership interest in Live Oak as well as a sale commission provided in the Partnership Agreement of 3.00%. (Andrew Dec., Ex. C, pg. 30-31, §11.14).

LFM never distributed the remaining balance of the funds to the other partners. These transactions were performed by LFM without any notice to the other partners, and without any authorization in the form of a partnership vote or any document indicating ratification or approval by the other partners.

The Partnership Agreement provides in section 3.8 entitled "Priority Over Other Partners" that no partner is to receive preference over any other:

"No Partner shall have priority over any other partner, with respect to the return of a Capital Contribution, or distributions or allocations of income, gain, losses, deductions, credits or items thereof." (Andrew Dec., Ex. A, pg. 14).

The Partnership Agreement also provides in section 4.7 entitled "Liquidating Proceeds" which specifies the manner in which funds are to be distributed to the

partners:

> "Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Partnership, or when any Partner's interest is liquidated, all items of income and loss first shall be allocated to the Partners' Capital Accounts under this Article Four, and other credits and deductions to the Partners' Capital Accounts shall be made before the final distribution is made. The final distribution to the Partners shall be made to the Partners to the extent of and in proportion to their positive Capital Account balances."
> (Andrew Dec., Ex. C, pg. 16).

Eight days after making these transfers, on September 12, 2024 LFM filed the present case for Live Oak, the LFM Bankruptcy Case, and cases for 57 other entities. There is no dispute that LFM never obtained any authorization to transfer $2,366,418.00 from Live Oak's accounts to itself.

LFM was fully aware it would be filing a bankruptcy petition for Live Oak immediately after transferring the funds to itself. For that reason, the bankruptcy filings were part of a common plan or scheme carried out by LFM to benefit itself and Mattson by first acquiring the funds and then preventing any challenge to these transfers by the other partners due to the bankruptcy filings.

The transfers and subsequent bankruptcy filing carried out by LFM were also clearly improper as Live Oak was solvent at all times. This is demonstrated by the list of 20 largest creditors filed on behalf of Live Oak by LFM on September 25, 2024 a copy of which is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit C. The list is entirely blank as there were no creditors for Live Oak at the time of the bankruptcy case filing.

This is further demonstrated by the schedules filed on behalf of Live Oak by LFM on November 15, 2024 a copy of which is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit D. The schedules list a total of three claims totaling $23,615.62 of which LFM claims for itself the sum of $18,798.64 as an "unpaid distribution." These claims are set forth in Schedule F as follows:

| Line | Nonpriority Creditor's Name | Address 1 | Address 2 | City | State | Zip | Basis for claim | Subject to offset (Y/N) | Contingent | Unliquidated | Disputed | Amount of claim |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | A & G Cleaning | Address on file | | | | | Trade | | | | | $70.00 |
| 3.2 | Home Tax Service of America, Inc., dba LeFever Mattson Property Management | 6359 Auburn Blvd. | | Citrus Heights | CA | 95621 | Payroll, maintenance and other expense reimbursements | | | | | $4,748.98 |
| 3.3 | LeFever Mattson, a California Corporation | 6359 Auburn Blvd. | | Citrus Heights | CA | 95621 | Unpaid Distribution | | | | | $18,796.64 |
| | | | | | | | | | | | TOTAL: | $23,615.62 |

(RJN, Ex. D, pg. 24).

On October 7, 2025, the creditors William N. Andrew and Sally G. Andrew Revocable Trust dated June 21, 2001 and the Burgess Trust dated October 9, 2006 filed a Notice of Partnership Meeting bearing docket entry number 2530 in the record of the LFM Bankruptcy Case. A copy of this notice is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit E. The stated purpose of the meeting as reflected in the notice was as follows:

> "The basis of the action to remove the current General Partner is that LeFever Mattson Inc. took actions that are in direct violation of the Partnership Agreement which constitutes cause for removal. Specifically, that on September 4, 2024 LeFever Mattson Inc. distributed $842,418 to itself from the accounts of Live Oak Investments L.P. representing a 21.6% share of the proceeds of the sale of Southwood Apartments, which was the sole real estate asset of Live
>
> Oak Investments L.P.. At the time of this distribution, LeFever Mattson Inc. did not distribute any sale proceeds to any of the other partners.
>
> This was a direct violation of the Partnership Agreement §3.8 entitled "Priority Over Other Partners" which states as follows: "No Partner shall have priority over any other partner, with respect to the return of a Capital Contribution, or distributions or allocations of income, gain, losses, deductions, credits or items thereof."
>
> This was also a direct violation of the Partnership Agreement §4.7 entitled "Liquidating Proceeds" which states as follows: "Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Partnership, or when any Partner's interest is liquidated, all items of income and loss first shall be allocated to the Partners' Capital Accounts under this Article Four, and other credits and deductions to the Partners' Capital Accounts shall be made before the final distribution is made. The final distribution to the Partners shall be made to the Partners to the extent of and in proportion to their positive Capital Account balances."
>
> On the basis of the foregoing actions, cause exists to remove LeFever Mattson Inc. as General Partner. At this partnership meeting a vote will be held on this removal as well as the other matters set forth above." (RJN, Ex. E, pgs. 1-2).

On October 9, 2025 LFM appeared at the meeting through its attorney at the time David Taylor and through the chief restructuring officer Bradley Sharp. LFM also cast votes during the partnership meeting. As a result of the partnership vote, LFM was removed as the general partner of Live Oak, Mattson was removed as president of Live Oak, William Andrew was appointed as the new general partner of Live Oak and the president, and Keller Benvenutti Kim LLP was removed as the legal representative of Live Oak and replaced with the Law Offices of Thomas P. Kelly III P.C..

On October 15, 2025 the special investigation counsel Donald S. Davidson filed the joint investigation report in the affairs of LFM bearing docket entry 2568 in the record of this case. (Hereinafter "Investigation Report"). A copy of the Investigation Report is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit F.

Of particular relevance to the present matter, "Attachment I" to the Investigation Report specifically addresses the fraud of LFM through transactions whereby LFM moved funds through Live Oak.

The first of these transactions is detailed in Attachment I-1 and reflects an October 5, 2018 payment from LFM to Live Oak of $481,000 followed by a subsequent payment from Live Oak to Sienna Pointe Apartments of $481,000, meaning that Live Oak did not incur any liability to any third party, nor did Live Oak retain any LFM funds. There are no claims here at all as the entire amount was transferred into and out of Live Oak. (RJN, Ex. F, pg. 222).

The second of these transactions is detailed in Attachment I-2 and reflects an August 7, 2019 payment from multiple entities to Live Oak totally $445,000 followed by a subsequent payment from Live Oak to LFM $445,000, meaning that again Live Oak did not incur any liability to any third party, nor did Live Oak retain any LFM funds. There are no claims here at all as the entire amount was transferred into and out of Live Oak. (RJN, Ex. F, pg. 223).

The third of these transactions is detailed in Attachment I-3 and reflects a December 10, 2019 payment by Live Oak to Sterling Pointe Apartments in the amount of $2,300,000.00. Once again, Live Oak did not incur any liability to any third party, nor did Live Oak retain any LFM funds. In this instance, Live Oak has a claim against Sterling Pointe Apartments in the amount of $2,300,000.00 which LFM and the OCUC have never pursued nor have they filed any proof of claim against Sterling Pointe Apartments. (RJN, Ex. F, pg. 224).

The fourth of these transactions is detailed in Attachment I-4 and reflects two December 31, 2019 payments by Live Oak to Carmichael Apartments in the amount of $940,000.00 and to Vaca Villa Apartments in the amount of $1,040,000.00. Once again, Live Oak did not incur any liability to any third party, nor did Live Oak retain any LFM funds. In this instance, Live Oak has claims against Carmichael Apartments and Vaca Villa Apartments in the total amount of $1,980,000.00 which LFM and the OCUC have never pursued nor have they filed any proof of claim against Carmichael Apartments or Vaca Villa Apartments. (RJN, Ex. F, pg. 225).

The fifth of these transactions is detailed in Attachment I-5 and reflects a May 18, 2020 payment by Live Oak to Walnut Crest Apartments in the amount of $295,000.00. Once again, Live Oak did not incur any liability to any third party, nor did Live Oak retain any LFM funds. In this instance, Live Oak has a claim against Walnut Crest Apartments in the total amount of $295,000.00 which LFM and the OCUC have never pursued nor have they filed any proof of claim against Walnut Crest Apartments. (RJN, Ex. F, pg. 226).

The sixth and last of these transactions is detailed in Attachment I-6 and reflects an October 18, 2022 payment by Live Oak to Sienna Pointe Apartments in the amount of $560,000.00. Once again, Live Oak did not incur any liability to any third party, nor did Live Oak retain any LFM funds. In this instance, Live Oak has claims against Sienna Pointe Apartments in the total amount of $560,000.00 which

LFM and the OCUC have never pursued nor have they filed any proof of claim against Sienna Pointe Apartments. (RJN, Ex. F, pg. 227).

On October 24, 2025 the Official Committee of Unsecured Creditors for the LFM case (Hereinafter "OCUC") filed a motion with this Court to have the October 9, 2025 partnership vote for Live Oak declared void as violating the automatic stay pursuant to 11 U.S.C. §362.  A copy of the OCUC motion is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit G.

On October 31, 2025 this Court held a hearing on the OCUC's stay violation motion. Following that hearing, on November 4, 2025 this Court entered an order granting standing to the OCUC to pursue a stay violation on behalf of LFM, and set a further hearing for the stay violation motion on November 13, 2025. A copy of this order is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit H.

On November 13, 2025 this Court held a second hearing on the stay violation motion. Following that hearing, on November 20, 2025 this Court entered the Stay Order thereby granting the OCUC motion and declaring the October 9, 2025 partnership vote for Live Oak as void. A copy of the Stay Order is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit I.

On November 30, 2025 William Andrew filed a notice of appeal of the order declaring the partnership vote for Live Oak as void. A copy of this order is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit J.

On December 12, 2025 the BAP issued an opening letter for the Appellate Case. A copy of this letter is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit K.

## IV. LEGAL ARGUMENT

### A. Legal standard for an appellate stay.

When deciding whether to issue a discretionary stay pending a bankruptcy appeal, Courts use the following four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. (*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); In re North Plaza LLC, 395 B.R. 113, 119 (S.D. Cal. 2008)).

The first two factors of the analysis are the most critical, and the Court will proceed to the remaining factors only after they have been met. *(Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### B. Likelihood of success on the merits.

In the Stay Order this Court relied exclusively upon the decision of the United States Bankruptcy Court for the Southern District of Texas, Houston Division by citing to the case of *In re Envision Healthcare Corp*., 655 B.R. 701 (S.D. Tex. 2023). No other cases or decisions were cited by this Court in support of its holding that the partnership vote violated the automatic stay.

#### 1. LFM was disassociated from Live Oak upon filing a bankruptcy petition.

Live Oak is a California partnership, and under California law upon the filing of a bankruptcy petition a partner is automatically disassociated from the partnership pursuant to Cal. Corp. Code § 16601 which provides in part as follows:

"A partner is dissociated from a partnership upon the occurrence of any of the following events:

(6) The partner's act or failure to act in any of the following instances:

(A) By becoming a debtor in bankruptcy."

(Cal. Corp. Code § 16601(6)(A)).

The effect of dissociation means that LFM lost all right to participate in the management of Live Oak. As Cal. Corp. Code § 16603 provides: "Upon a partner's dissociation, all of the following apply: (1) The partner's right to participate in the management and conduct of the partnership business terminates." (Cal. Corp. Code § 16603(1)).

There is no reasonable dispute on this point. In every California and Ninth Circuit bankruptcy decision referencing this California code section the result is the same - ironclad language that upon the filing of a petition, the partner is disassociated as a matter of law automatically. Below are several examples.

"In this instance, Defendant's bankruptcy filing triggered his automatic dissociation from the partnership. See Cal Corp. Code § 16601(6)(A)." *(Johnson v. Johnson*, E. Dist. Cal. 2016 U.S. Dist. LEXIS 38106, 2016 LX 35666, 2016 WL 1138178).

"... [The debtor] was dissociated from the partnership as a matter of law on the day he filed his bankruptcy petition. Cal. Corp. Code § 16601(6)(A)." (*Mansdorf v. Epps*, N. Dist. Cal. 2011 U.S. Dist. LEXIS 171825, 2011 LX 43866).

Upon the debtor's "... filing of the bankruptcy petition, he became a dissociated partner. Cal. Corp. Code § 16601(6)(A)." (*Fotouhi v. Mansdorf*, N. Dist. Cal. 427 B.R. 798, 802 (2010)).

This Court held that this California statute does not apply. "The pertinent language of California Corporations Code §§ 15906.03 and 16603 are impermissible ipso facto clauses that are inconsistent with Bankruptcy Code § 541(c)(1)(B) and thus violative of the Constitution's Supremacy Clause." (RJN Ex. I, 4:15-18). This Court did not cite any precedent or authority for this statement.

In contrast to this holding, it is black letter law that a debtor's pre-bankruptcy rights in property are determined according to state law. (*Butner v. United States*, 440 U.S. 48, 55 (1979)). Under California law, the interest of a limited partner is referred to as the 'transferable interest' which encompasses the individual partner's

stake in the partnership, including rights to distributions, profits, and losses. (Cal. Corp. Code § 15901.02(ak)). As the California Supreme Court has repeatedly held, partners to a limited partnership have no property interest in specific partnership assets. (*Evans v. Galardi*, 16 Cal.3d 300, 307 (1976)). Rather, the transferable interest represents only the right to receive a share of the profits or income, and to the return of their contribution. (*Id*.).

As discussed above, LFM has already received its share of the profits, income, and the return of their contribution arising from the sale of the Southwood Apartments. On September 4, 2024 LFM made three payments to itself in the total amount of $2,366,418.00. (RJN, Ex. B, pgs. 19-20). This represents the 21.214% ownership interest of LFM in Live Oak as well as a sale commission provided in the Partnership Agreement of 3.00%. (Andrew Dec., Ex. C, pg. 30-31, §11.14). Under California's partnership law, once LFM was paid out it had no further transferable interest in Live Oak under Cal. Corp. Code § 15901.02(ak). The entirety of the transferable interest was already distributed out of Live Oak and to LFM prior to the filing of the bankruptcy petitions.

In the present case, this Court misconstrued California law under which the interest of a limited partner is restricted to the transferable interest under Cal. Corp. Code § 15901.02(ak). This Court instead created a new 'managerial interest' which does not appear in any California statute or case law. "The court rejects Andrew's argument that LM's managerial rights terminated when it filed its Chapter 11 bankruptcy." (RJN Ex. I, 4:14-15). This directly contradicts the holding of the California Supreme Court that partners in a limited partnership have no property interest in specific partnership assets. (*Evans v. Galardi, supra* 307). There is no other interest held by a partner to a California partnership.

This Court did not apply California law in the Stay Order, but instead applied the partnership law of Ohio. This Court cited to *In re Cardinal Industries* 105 B.R. 834 (Bankr. S.D. Ohio 1989; "*Cardinal*") as follows: "LM's pre-petition

property rights thus included its general partnership duties under the Agreement. See, e.g., *Cardinal Indus., Inc. v. Buckeye Fed. Sav. & Loan Ass'n (In re Cardinal Indus., Inc.)*, 105 B.R. 834 (Bankr. S.D. Ohio 1989)." (RJN Ex. I, 4:7-9). The Court in *Cardinal* was interpreting the partnership law of Ohio, not California, which actually creates three interests bearing different names and meanings as set forth in the case:

"Uniform partnership law gives a general partner in a limited partnership an interest in the partnership (the 'Partnership Interest'), a right to participate in the management (the 'Management Interest'), and status as a tenant in partnership (the 'Tenancy Interest'). See Ohio Revised Code §§1775.23 and 1782.29." (*Cardinal* at 848).

California law does not have nor does it create any partnership interest referred to as a 'partnership interest' or a 'management interest' or a 'tenancy interest.' There is only the transferable interest as defined by Cal. Corp. Code § 15901.02(ak).

LFM was disassociated from Live Oak upon the filing of a bankruptcy petition, and hence there was no interest held by LFM which was property of the bankruptcy estate to which the automatic stay could apply.

## **2. The Live Oak agreement is an executory contract under 11 U.S.C. §365.**

The partnership agreement for Live Oak was executed effective March 25, 2015. (See Andrew Dec. Ex C). It included more than a dozen investors and LFM as partners, with LFM acting as the general partner.

In the present case, this Court refused to address the fact that the Live Oak partnership agreement is clearly an executory contract under 11 U.S.C. §365. "Second, this Court is not determining whether LM's general partnership duties arise from an executory contract that may not be assumable under Bankruptcy Code §365." (RJN Ex. I, 6:6-8).

The general rule is that partnership agreements are executory contracts. "Partnership agreements generally are executory contracts." (3 Collier on Bankruptcy P 365.02(2)(b) (16th 2023)). This is true because partners generally have a continuing duty to each other under any partnership agreement and hence is executory because "performance remains due to some extent on both sides." (*Mission Prod. Holdings v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019)).

For that reason, a personal service contract is not assumable under 11 U.S.C. § 365 without the consent of the non-debtor partners. This stems from the Ninth Circuit's adoption of the 'hypothetical test' under 11 U.S.C. § 365(c)(1). ( *In re Catapult Entertainment, Inc*., 165 F.3d 747 (9th Cir. 1999)). In *Catapult*, the Ninth Circuit adopted the 'hypothetical test' where the debtor sought to assume non-exclusive patent licenses for video game technology. The Court reversed the bankruptcy court's approval, holding that federal patent law excused the licensors from accepting performance from a hypothetical assignee, thus barring assumption even without intent to assign. It explicitly rejected the 'actual test' and emphasized statutory plain meaning

The hypothetical test bars assumption of an executory contract if applicable non-bankruptcy law excuses the non-debtor party from accepting performance from anyone other than the original debtor, even if no assignment is intended. California contract law makes personal services non-delegable under Cal. Comm. Code § 2210 which prohibits delegation where the other party has a substantial interest in the original promisor's performance. "Rights likewise cannot be assigned if the assignment would materially impair the non-assigning party's chance of obtaining the performance he expected." *(Farmland Irrigation Co. v. Dopplmaier*, 48 Cal. 2nd 208, 222 (1957). For that reason, executory contracts are generally non-assignable without consent because the non-debtor bargained for the specific individual's performance. The Live Oak partnership agreement reflects this intent by having lengthy and detailed restrictions on transfers of partnership

interests, and voids any alleged transfer without meeting the requirements. "Any Transfer or Encumbrance of a Partnership Interest without such approval shall be void." (Andrew Dec., Ex. C, pg. 18, §8.2).

As discussed above, the filing of a bankruptcy petition causes dissociation of a partner under Cal. Corp. Code § 16601. In turn, the disassociation terminates the right to participate in management under Cal. Corp. Code § 16603(1). For that reason, the bankruptcy estate acquires only the economic interest (e.g., rights to profits, losses, and distributions), not governance or management rights given that partnership agreements are executory contracts and hence non-assumable under 11 U.S.C. § 365(c) due to the personal services nature of partnerships and also the general unwillingness of non-debtor partners to accept a substitute.

While it would be correct that §541(c)(1) would override an ipso facto clauses in single-owner entities (*Fursman v. Ulrich*, 440 B.R. 821 (B.A.P. 9th Cir. 2010)) the same is not true of multi-party entities where other partners' interests are protected by limiting the bankruptcy estate's interest to economic rights only. (e.g., *In re Cutler*, 165 B.R. 275 (Bankr. D. Ariz. 1994); see also *In re Ehmann*, 319 B.R. 200 (Bankr. D. Ariz. 2005)).

In the present case, there is no reasonable dispute that the Live Oak partnership agreement was an executory contract both under applicable bankruptcy law and under California law. This is especially true given that it was a multi-party contract rendering it non-assumable under 11 U.S.C. § 365(c)(1). Consequently, no 'management interest' in Live Oak became property of the bankruptcy estate for LFM pursuant to the holding of the Ninth Circuit in *In re Catapult Entertainment, Inc.,* 165 F.3d 747 (9th Cir. 1999).

### **3. LFM breached the Live Oak partnership agreement prior to filing the petition.**

In the present case, LFM was already in breach of the Live Oak partnership agreement before it ever filed a bankruptcy petition. As outlined above, without

any notice to the other partners of Live Oak, and without any partnership meeting, on September 4, 2024, LFM made three transfers totaling $2,366,418.00 from Live Oak to itself. (RJN, Ex. B, pgs. 19-20). LFM maintains this represents the 21.214% ownership interest in Live Oak as well as a sale commission provided in the Partnership Agreement of 3.00%. (Andrew Dec., Ex. C, pgs. 30-31, §11.14).

LFM never distributed the remaining balance of the funds to the other partners. These transactions were performed by LFM without any notice to the other partners, and without any authorization in the form of a partnership vote or any document indicating ratification or approval by the other partners.

The Live Oak Partnership Agreement provides in section 3.8 entitled "Priority Over Other Partners" that no partner is to receive preference over any other:

> "No Partner shall have priority over any other partner, with respect to the return of a Capital Contribution, or distributions or allocations of income, gain, losses, deductions, credits or items thereof." (Andrew Dec., Ex. C, pg. 14).

The Partnership Agreement also provides in section 4.7 entitled "Liquidating Proceeds" which specifies the manner in which funds are to be distributed to the partners:

"Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Partnership, or when any Partner's interest is liquidated, all items of income and loss first shall be allocated to the Partners' Capital Accounts under this Article Four, and other credits and deductions to the Partners' Capital Accounts shall be made before the final distribution is made. The final distribution to the Partners shall be made to the Partners to the extent of and in proportion to their positive Capital Account balances." (Andrew Dec., Ex. C, pg. 16).

Eight days after making these transfers, on September 12, 2024 LFM filed the present case for Live Oak, the LFM Bankruptcy Case, and cases for 57 other

entities. There is no dispute that LFM never obtained any authorization to transfer $2,366,418.00 from Live Oak's accounts to itself.

LFM was fully aware it would be filing a bankruptcy petition for Live Oak immediately after transferring the funds to itself. For that reason, the bankruptcy filings were part of a common plan or scheme carried out by LFM to benefit itself and Mattson by first acquiring the funds and then preventing any challenge to these transfers by the other partners due to the bankruptcy filings.

It was this breach of the partnership agreement that gave rise to the vote to remove LFM as general partner for cause. This was specifically stated in the notice of the partnership meeting as follows:

> "The basis of the action to remove the current General Partner is that LeFever Mattson Inc. took actions that are in direct violation of the Partnership Agreement which constitutes cause for removal. Specifically, that on September 4, 2024 LeFever Mattson Inc. distributed $842,418 to itself from the accounts of Live Oak Investments L.P. representing a 21.6% share of the proceeds of the sale of Southwood Apartments, which was the sole real estate asset of Live
>
> Oak Investments L.P.. At the time of this distribution, LeFever Mattson Inc. did not distribute any sale proceeds to any of the other partners.
>
> This was a direct violation of the Partnership Agreement §3.8 entitled "Priority Over Other Partners" which states as follows: "No Partner shall have priority over any other partner, with respect to the return of a Capital Contribution, or distributions or allocations of income, gain, losses, deductions, credits or items thereof."
>
> This was also a direct violation of the Partnership Agreement §4.7 entitled "Liquidating Proceeds" which states as follows: "Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Partnership, or when any Partner's interest is liquidated, all items of income and loss first shall be allocated to the Partners' Capital Accounts under this Article Four, and other credits and deductions to the Partners' Capital Accounts shall be made before the final distribution is made. The final distribution to the Partners shall be made to the Partners to the extent of and in proportion to their positive Capital Account balances."
>
> On the basis of the foregoing actions, cause exists to remove LeFever Mattson Inc. as General Partner. At this partnership meeting a vote will be held on this removal as well as the other matters set forth above. (RJN, Ex. E, pgs. 1-2).

A breach of an executory contract by a debtor-in-possession gives rise to a general claim against the estate for the non-breaching non-debtor party to the

contract. (11 U.S.C. § 365(g)). And once the contract is breached, the debtor in possession can no longer enforce its provisions. (See, e.g., *In re Warner*, 480 B.R. 641, 650-51 (Bankr. N.D. W. Va. 2012)). LFM engaged in outright fraud by writing itself checks for millions of dollars right before filing a bankruptcy petition and without any notice or permission from the other partners. This was a spectacular and sinister effort to loot funds for LFM's own use and with the specific intent to defraud the remaining partners. There is overwhelming evidence to support the removal of LFM for cause given that it was in breach of the partnership agreement prior to filing a bankruptcy petition.

## C. Live Oak will suffer irreparable harm as LFM is seeking to dissolve Live Oak.

LFM has a motion to consolidate all 57 of the debtor entities on calendar for January 23, 2026. A copy of the December 1, 2025 amended motion to consolidate is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit L. A copy of the amended notice of the hearing on this motion is attached to the concurrently filed Request for Judicial Notice and marked as Exhibit M.

If a stay is not granted Live Oak and its investors will suffer irreparable harm as there is presently the sum of $3,140,522.00 on deposit in the account for Live Oak, and LFM has already transferred $2,366,418.00 only four days prior to filing a bankruptcy petition. This money will no doubt vanish as soon as LFM consolidates Live Oak into the rest of the debtor entities. Recovering those funds will require interminable litigation against all manner of third parties to whom the funds have been distributed through the pending chapter 11 process, and the partners of Live Oak will have to pay for that litigation as well. There is no way to avoid this harm other than temporarily halting further activity in regard to Live Oak in the pending bankruptcy cases until such time as the appeal is resolved. Absent a stay, Live Oak faces irreparable harm through the likely permanent loss of these partnership assets.

**D. No substantial injury to other parties.**

The only other party at issue in the present matter is LFM. LFM cannot suffer any harm from a stay. LFM has already caused harm to Live Oak and the other partners by breaching the partnership agreement pre-petition by unilaterally withdrawing $2,366,418 without partner approval or equal distribution in direct violation of §§ 3.8 and 4.7 of the Live Oak Partnership Agreement, which clearly constitutes fraud and justifies LFM's removal for cause. And even were LFM to allege some kind of harm from a stay, LFM has already received its economic interest through the funds it looted on the eve of a bankruptcy filing. For all of these reasons, there is no credible substantial injury to other parties which would arise from an appellate stay.

**E. Public interest.**

It is unclear whether the public has any direct interest in the present matter. It is a dispute between the partners of Live Oak and the cabal controlling LFM. On the general level, the public always has an interest in upholding state partnership laws and preventing debtor abuse as is the case in the present matter.

## V. CONCLUSION

Andrew has demonstrated a strong likelihood of success on the merits of the pending bankruptcy appeal, satisfying the critical first factor under *Hilton vs. Braunskill*. The Bankruptcy Court's Stay Order erroneously disregarded California law, which mandates automatic dissociation of a partner upon bankruptcy filing under Cal. Corp. Code § 16601(6)(A), stripping LFM of any management rights per § 16603(1). This is reinforced by consistent precedents like *Johnson vs. Johnson* and *Mansdorf vs. Epps*, confirming that no managerial interest enters the estate. The Court's reliance on inapplicable Ohio law from *In re Cardinal Industries* and its invention of a non-existent 'managerial interest' contravenes black-letter principles from *Butner vs. United States*, which defer to state law for pre-petition property rights.

Furthermore, the Live Oak Partnership Agreement qualifies as an executory contract under 11 U.S.C. § 365, non-assumable without consent due to its personal services nature, as per the Ninth Circuit's hypothetical test in *In re Catapult Entertainment*. LFM's pre-petition breach - unilaterally withdrawing $2,366,418 without partner approval or equal distribution - violates §§ 3.8 and 4.7 of the Agreement, constituting fraud and justifying removal for cause. This breach precludes LFM from enforcing the Agreement, rendering the vote to remove it valid and outside the automatic stay.

Absent a stay, Appellant faces irreparable harm through loss of control over partnership assets, while no substantial injury befalls LFM, which has already received its economic interest. The public interest favors upholding state partnership laws and preventing debtor abuse. Accordingly, a discretionary stay pending appeal is warranted to preserve the status quo and ensure justice.

Dated: January 21, 2026

Thomas P. Kelly III
Attorney at Law

## VI. CERTIFICATION OF INTERESTED PARTIES & RELATED CASES

As required by BAP Rule 8010(a)-1(c) made applicable to this proceeding under CAND Local Rule 16-4, Appellant William Andrew makes the following certifications:

The undersigned certifies that the following parties have an interest in the outcome of this appeal. These representations are made to enable the Court to evaluate possible disqualification or recusal.

Appellant William Andrew
c/o Thomas P. Kelly III, Esq.
50 Old Courthouse Square
Suite 609
Santa Rosa, California
95404

Official Committee of Unsecured Creditors
John D. Fiero & Jason H. Rosell
Pachulski Stang Ziehl & Jones LLP
One Sansome Street
34th Floor
Suite 3450
San Francisco, California
94104-4436
Telephone: 310-277-6910
Facsimile: 310-201-0760
Email: jfiero@pszjlaw.com,
jrosell@pszjlaw.com

LeFever Mattson Inc.
Live Oak Investments LP.
Thomas B. Rupp & Tobias S. Keller
Keller Benvenutti Kim LLP
425 Market Street
26th Floor
San Francisco, California
94105
Telephone: 415-496-6723
Facsimile: 650-636-9251
Email: trupp@kbkllp.com,
tkeller@kbkllp.com

The undersigned certifies that the following are known related cases and appeals:

24-10545 *In re LeFever Mattson Inc.*, United States Bankruptcy Court, Northern District of California, Santa Rosa Division

24-10511 *In re Live Oak Investments LP*, United States Bankruptcy Court, Northern District of California, Santa Rosa Division

Dated: January 21, 2026

_____
Thomas P. Kelly III
Attorney at Law

## VII. CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, the undersigned counsel of record for Appellant William Andrew as the general partner of the Debtor-in-possession Live Oak Investments LP hereby certifies that this Application for Appellate Stay complies with the type volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,743 words. Counsel has relied upon the word count of the computer program used to prepare this brief, Wordperfect X5.

The undersigned further hereby certifies that Appellant's Opening Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Times New Roman 14-point font, a proportionally spaced typeface.


Dated: January 21, 2026

_Thomas P. Kelly III_
_____
Thomas P. Kelly III
Attorney for Appellant